Filed 3/21/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| K.T.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>E.S.,<br><br>    Defendant and Respondent. | B333127<br><br>(Los Angeles County<br>Super. Ct. No. 23AVRO00768) |

APPEAL from an order of the Superior Court of Los Angeles County, Jessica C. Kronstadt, Judge. Affirmed in part, reversed in part, and remanded with directions.

Katten Muchin Rosenman, Zia F. Modabber, Arron J. Pak; Family Violence Appellate Project, Cory D. Hernandez and Jennafer Dorfman Wagner for Plaintiff and Appellant.

Winston & Strawn, Troy M. Yoshino; California Women's Law Center and Julianna Gesiotto as Amicus Curiae on behalf of Plaintiff and Appellant.

No appearance for Respondent.

—————————————

The trial court granted appellant K.T.'s request for a domestic violence restraining order (DVRO) against E.S. Nevertheless, K.T. argues the trial court abused its discretion by failing to include the parties' minor children as "other protected people" in the DVRO. She also argues the court erred by not adhering to the correct legal standard of a showing of "good cause" based on the "totality of the circumstances." (Fam. Code,[1] §§ 6320, subd. (a), 6301, subd. (d).)

We agree and find the trial court erred in using the wrong legal standard in connection with K.T.'s request. We find "good cause" to include the children as protected people in the DVRO. We reverse and remand in that regard, directing the trial court to modify the DVRO in accordance with this decision. We otherwise affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

I. *Request for a Domestic Violence Restraining Order*

On May 30, 2023, 26-year-old K.T. filed a request for a DVRO against her ex-partner, 42-year-old E.S.,[2] with whom she shares three daughters—six-year-old D.S., five-year-old I.S., and four-year-old H.S.

K.T.'s DVRO request and declaration provide:

---

[1]     Undesignated statutory references are to the Family Code.

[2]     Age difference may be relevant for understanding the relationship dynamics in a DVRO case. (See, e.g., *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 112 [21-year difference—"Parris was 27 years old and Christopher was 48 years old"].)

2

K.T. was E.S.'s victim for over seven years, experiencing physical injuries, rape, fear, anxiety, and trauma by E.S. She was a minor when they met in 2015 in Honduras. He was a human trafficker and took her first to Mexico and then to the United States. He was very violent, often drunk from alcohol or high on drugs. She tried to escape while in Mexico but he threatened to kill her if she left him. In the U.S., he moved her to "the middle of nowhere, living in a trailer home."[3] K.T. attached, as an exhibit to her DVRO request, an aerial photo of the trailer home they resided in, which she described as located in a "desolate" area. K.T. had no access to a car and he monitored her cell phone usage, allowing her to use the phone only while in his presence. She was alone and scared.

K.T. started taking birth control pills after their first child was born. "When our first child was just 2 months old, he forced himself on me and I got pregnant again." K.T. was surprised by the pregnancy and E.S. later admitted "he switched [her] pills for vitamins, laughing and telling [her] that it was his plan to have [K.T.] with lots of kids so that no other man would want [her] and [she] could never leave him." K.T. and her children were completely financially tied to him as she had no independent means of support. She was not allowed to go to work, not allowed to run errands or go to the store without him; he established full control of her life.

---

[3] K.T. clarified during her testimony at the DVRO proceedings that the closest neighbor "was about a ten-minute walk away" and the "closest store, Walmart, was 15 minutes away from that place."

E.S. viciously hit the children on numerous occasions, leaving them bruised with red marks and welts. He hit them with his palms, slippers, and a belt. When K.T. interfered, he would also hit her. From 2016 until 2022, K.T. tried to leave several times, even on foot, carrying the children, but E.S. always followed, found, and stopped her.

K.T. described recent instances of abuse after she told E.S. she was leaving him.

"That month [(June 2022)] turned into one of the worst times of my life. He constantly yelled at me, hovering over me, insulting me, angry at me for thinking that I could leave him." He threatened to kill K.T. if she ever left and also threatened to kill himself and the children. "To emphasize his point, he took out a rope and hung it over one of the ceiling beams and said that it was ready for use." ~(AA 23-26)~

On June 13, 2022, while E.S. drove the car with K.T. seated in the passenger seat and the children in the backseat, E.S. accused K.T. of "being the victim of a spell." He pulled the car over and "started to push [her] out." He hit her face and "busted" her lip. The children "yelled at him to stop." He ignored them and grabbed K.T. by her hair and "slammed" her head against the car's middle console.

A few days later, during the evening of June 18, 2022, K.T. went to bed with H.S and D.S., who was very ill. E.S. came into the bedroom around 11:30 p.m., laid next to K.T., grabbed her breast and between her legs. K.T. told him to stop, but he ignored her and said he "was going to make my life a living hell, and that he was not going to make it easy . . . to leave him." He took off his belt, tore off her leggings, and "severely beat" her with the buckle. The parties' "sick daughter woke up" but E.S.

4

did not stop and told D.S. to "go back to sleep."  D.S. "said she needed to pee . . .  to get [E.S.] to stop hurting [K.T.]."  While E.S. took D.S. to the bathroom, K.T. quickly hid her smartwatch behind the headboard so that she could later use it to call 911.  When E.S. returned, he grabbed K.T. by her hair and dragged her from the bedroom to the living room.  He threatened to "hang" her—referencing the rope from the ceiling beam.  K.T. "begged him to stop hurting" her and ran back to the bedroom.  E.S. grabbed her from behind, pushed her onto the bed and "forced himself sexually on [her]" while "[t]wo of [the] kids were in the same room, on the same bed."  K.T. began to cry loudly but E.S. told her he "would break [her] mouth if [she] did not stop crying."  E.S.'s sexual assault continued until about 2 a.m.

The next day, on June 19, 2022, K.T. used the smartwatch to call for help.  The police came and arrested E.S.  K.T. was transported to a hospital with the children, where K.T. was treated for her injuries.  Different people interviewed her, took photos of her, tested her body for DNA evidence, and took her ripped clothes as evidence.  A criminal investigation was pending with the Los Angeles County Sheriff's Department.  K.T. attached, as an exhibit to her DVRO request, a copy of her June 19, 2022 hospital records from the Antelope Valley Medical Center.

Upon being discharged from the hospital and while E.S. was in jail, K.T. took their three children and fled to her aunt's house in Houston, Texas.  She kept her new address hidden after escaping his abuse.

A restraining order was issued in Houston, Texas on September 13, 2022, protecting K.T. from E.S. At this time, E.S. accessed K.T.'s Facebook account,[4] changed her login and password information, falsely published posts pretending to be K.T., read her private messages with family members, discovered her hidden new address, and showed up at her place of residence in Texas. She told E.S. he was violating the restraining order but he did not leave. He called their six-year-old daughter and "manipulated" her to come outside to him. K.T. was "very scared and did not know what to do" and "felt [she] had no choice but to let him see the kids." After learning her new address, E.S. kept showing up; she "could not avoid him anymore" and "pretend[ed] to be friendly with him to avoid angering him."

On December 24, 2022, E.S. demanded that K.T. allow the children to spend part of the holidays with him. He promised to bring them back on a date certain. Instead, on December 26, 2022, he abducted the children from Texas, took them to Mexico[5] and thereafter to California,[6] both without K.T.'s knowledge or

---

[4]     K.T. clarified during her testimony that while in Texas, she "got a notification on [her] Facebook that somebody had opened a session in Los Angeles [then] he changed all of [her] Facebook information, and continues to control [her] Facebook account." ~(RT 40-41)~

[5]     On December 31, 2022, E.S. published on his Facebook profile a photo of their daughters with the location "Tijuana, Mexico" and a post, stating "No one can separate us from now on forever."

[6]     E.S. received a response from daughter H.S. that she was in California.

consent. E.S. refused to return the children and did not respond to K.T.'s phone calls. After five days, E.S. responded and said K.T. could see the kids only if she returned to California and restarted her relationship with him. K.T. called the police who told her they could not do anything as E.S. was the father and there were no custody orders in place. K.T. attached as an exhibit to her DVRO request a copy of the December 31, 2022 police report.

E.S. kept pressuring K.T. to remove the restraining order and said that K.T. could only see the children if she returned to California and agreed to get back together with him. K.T. ultimately dismissed the Texas restraining order. In February and March 2023, E.S. published posts on his social media accounts about "making someone 'pay' and 'living hell,' " which K.T. took from their past discussions as directed towards her and referred to killing her or their children to punish her. Similarly, on March 8, 2023, E.S. published on his Facebook profile, "I think they hurt me so much that I have a huge emptiness and an unquenchable thirst of revenge instead of a heart. . . . [N]o one leaves this earth without paying what they owe, so if they owe me, they pay me, and that's it." These posts worried K.T. because "it shows he feels entitled to hurting others, whom I believe could be me or our children, because he himself feels wronged." She was very worried about their children as E.S. had never taken care of them before and had been violent towards them in the past. K.T. attached as an exhibit to her DVRO request screenshots of E.S.'s Facebook posts.

In her DVRO request, K.T. asked that her three children be named as other protected people in the DVRO. In response to why her children needed protection, K.T. stated: "See Declaration

7

of [K.T.] In summary, [E.S.] is a bad father and human being. He has physically abused our three daughters. He is mentally unstable from abusing drugs and alcohol on a regular basis. He has beaten me and our daughters on several occasions. Almost all instances of abuse is done in front of the children. He has abducted [the children] from me in Texas to California, and tells me that he would only return them to me if I get back with him." K.T. "live[s] with ongoing fear that he will kill [her]."

K.T. requested sole legal and physical custody of the children and child support from E.S. She requested that E.S. be denied visitation, or alternatively, that visitation be professionally supervised. She also requested orders to prevent child abduction, preventing E.S. from taking the children out of California or Texas without K.T.'s permission.

K.T. requested that E.S. be ordered not to harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, keep under surveillance or disturb her peace. She requested the court order E.S. not to contact her and to stay 100 yards away her, her home and vehicle, her place of work/school, and her children's school or childcare. She also requested E.S. be ordered to attend a 52-week batterer intervention program as well as an alcohol and drug program.

II. *Temporary Restraining Order*

The trial court granted K.T. a temporary restraining order (TRO) against E.S., effective until the hearing on her DVRO request, set for June 22, 2023.

The TRO also ordered that E.S. not to harass, attack, threaten, assault (sexually or otherwise), hit, follow, stalk, keep under surveillance, impersonate (on the internet, electronically, or otherwise), or disturb K.T.'s peace. E.S. was ordered to stay

8

100 yards away from K.T., her home and vehicle, and her workplace. E.S. was also ordered not to contact K.T. except to communicate about the children.

The TRO did not name the parties' children as "other protected people." The trial court indicated its reason for denial as "[n]o showing of imminent risk of harm to children." K.T.'s child custody request was denied pending the hearing.

Upon E.S.'s request for a continuance, the court postponed the hearing from June 22, 2023, to August 7, 2023. E.S. did not file a response or opposition to K.T.'s DVRO request.

III.    *Hearing on K.T.'s DVRO Request*

On August 7, 2023, the trial court held the hearing on K.T.'s DVRO request. Both parties were present in court with their respective counsel; both parties were sworn.

The trial court reviewed K.T.'s declaration which indicated a history of abuse spanning from at least June 13, 2022 through March 2023 and which concluded with social media posts. The trial court recounted a few instances of abuse discussed by K.T. in her DVRO request: "[O]n December 24th of last year, your claim—[that E.S.] abducted—took the children, and refused to return them to you but responded only after you had called him for five days and only after it seemed as though you indicated you would restart your relationship with him and would return to California. [¶] Is that correct—that's one instance of abuse, ma'am?" K.T. replied, "Correct."

The trial court continued, "[A]nd then the other—I did note . . . throughout your request, you indicate that [E.S.] had . . . sexually abused you, physically abused you, that [E.S.], in violation of a temporary restraining order in Texas, came to your residence in Texas, that he had privately messaged your family

9

members and that you did however allow him to . . . see your children." The court asked K.T., "You also indicated that the abuse[,] physical and sexual[,] occurred in front of your children. Is that also accurate?" K.T. answered, "Yes." The trial court asked, "And you're requesting that you have sole legal and sole physical custody of the children in addition to the [DVRO] with respect to you. Is that correct?" K.T. replied, "Yes. Correct." The trial court admitted K.T.'s declaration as testimony.

The trial court told K.T.'s counsel, "[I]f you do want to ask your client additional questions, you may. And if there's anything else that you want the court to consider, I'd be happy to do that. However what I do not want is to go through the declaration she's already—admitted— is signed under penalty of perjury. The court does not need you to go through every single instance of abuse. It's already been listed in the declaration."

K.T. was sworn and testified.

K.T.'s counsel first "want[ed] to highlight . . . about the children since the initial [TRO] did not include them as protected parties." K.T. testified that two of her daughters were present during the June 18, 2022 incident including when E.S. dragged her by her hair. K.T. testified that all children were present on June 13, 2022 when E.S. slammed her face onto the car's middle console and hit her face. K.T. saw and heard her daughters "in the back [who] started to scream asking him to stop. He grabbed me by the hair, and he slammed me against the dashboard of the car." The children continued "screaming, telling him to stop."

K.T.'s counsel referenced K.T.'s declaration about her "long history of domestic abuse" and asked her to "describe some of the events that—that the children were present for." The trial court interjected, "I recognize that you're getting into child custody

10

issues, but *this doesn't seem to me to be directly relevant to the [DVRO] that's at issue.*" (Italics added.) K.T.'s counsel proffered that "[p]art of the request is that the children be protected parties, your Honor. And part of the reason for that is that they've been exposed to this abuse for all these years especially during the major incidents." The trial court replied, "To the extent that you can, narrow that."

K.T. testified about the aftermath of the June 18, 2022 incident. The police officers took K.T. and the children to the hospital the next day, where the "doctors gave me pain medication because I had pain in my head—and . . . I had injuries—bodily injuries. They treated my injuries. [¶] Then they gave me . . . counseling. And then I was taken to a room where there was a medical forensic specialist [who] took pictures of each one of the injuries on my body. I was asked to remove my clothing, to disrobe. And they took—samples of DNA from my private parts."

Cross-examination commenced. Since E.S.'s abduction of the children, K.T. continued to reach out to him and "begged him to return them" to no avail. "I haven't seen my daughters for seven months." Counsel notified the court that the children were enrolled in school in Texas while with K.T., but "were not attending school here during the seven months that they were" in Mexico and California with E.S. The trial court asked E.S. whether it is true that the children have attended school during this time, and E.S. admitted he only recently enrolled them for school on August 3, 2023.

Counsel also notified the court that K.T. recently gave her statement to Detective Alicia Ramirez in connection with the ongoing criminal investigation following E.S.'s June 19, 2022

11

arrest. E.S. was advised of his Fifth Amendment rights. He did not testify.

The trial court admitted only one exhibit—the aerial photo of the trailer home, but did not admit K.T.'s June 19, 2022 medical records, the December 31, 2022 police report, and the screenshots of E.S.'s Facebook posts. "[T]he exhibits, which I do note . . . seem to be medical records—from [a hospital] as well as a police report, is not going to be admitted. That is a totally complete hearsay document that will not be admitted into evidence. [¶] The photographs [of the trailer home]—well, you can go through." "That doesn't seem to me the court—consider[ed] objectionable."

IV.    *Trial Court's Ruling*

The trial court granted K.T.'s DVRO request against E.S. and issued a permanent DVRO protecting K.T. from E.S., effective for a period of three years until August 7, 2026.

The trial court noted it did not find credible the portion of K.T.'s testimony "regarding the dates that were missed or not missed in the state of Texas. So the court in this order is not basing its order on any alleged violation of the restraining order that occurred in the state of Texas." The court found "there was testimony from [K.T.] regarding both—at least physical abuse that occurred in June of 2022 and that was consistent with what she stated in court today. And again there's little to no cross-examination as to what did or did not take place in June of 2022. [¶] This court is operating under a preponderance of the evidence standard not a beyond a reasonable doubt standard. [¶] I would also note that [K.T.] testified that she did contact the police after the children went missing in December of 2022, which—she did contact the police. She did contact the police in June of 2022; and

12

police, as both parties are aware, are now involved. [¶] So the court does find based on a preponderance of the evidence that an act or past acts of domestic violence have occurred."

E.S. was ordered not to harass, attack, threaten, assault (sexually or otherwise), hit, follow, stalk, keep under surveillance, impersonate (on the internet, electronically, or otherwise), or disturb K.T.'s peace.  E.S. was ordered to stay 100 yards away from K.T., her home and vehicle, and her workplace.  E.S. was also ordered not to contact K.T. except to communicate regarding any court-ordered visits with the children.  E.S. was ordered to attend a 52-week batterer intervention program and show written proof of completion to the court.

The trial court found itself "in a very difficult position with regard to what to do with the children because the children were not listed as protected parties under [K.T.'s] current request.  And the court is not going to list them as protected parties under the domestic violence restraining order."  The court told K.T.'s counsel, "I do take your point . . . that abuse that occurs in front of children is still certainly very traumatic to children and should not occur.  However, there has been no credible evidence, at least, in front of this court regarding any physical or sexual abuse that has been sustained by the children in this case."

"With respect to custody of the children, the court is now in a very . . . difficult position. . . . [T]he children cannot remain with [E.S.]"  The trial court expressed concern that the children have been with E.S. in California for seven months and that K.T. is requesting the children to return to her home in Texas to "start an entirely new school" in about a week which is "a lot on kids."  K.T.'s counsel informed the court "that it wasn't our plan to be right at the heels of the school year, but it's what happened."  The

13

trial court noted E.S. had used his one request "for a continuance, which he's entitled to ask for."  The court ordered the parties to go to mediation with the family court as soon as possible so that custody and visitation orders can be in place.  The trial court awarded joint legal custody, and temporary physical custody of the children to K.T. while she is in California, and "when you go back to Texas, they are going to go back to live with [E.S.] until the mediation."  The court reserved jurisdiction on the issues of child custody, child support, and attorney fees.

K.T. filed a notice of appeal.

On December 31, 2024, this court granted the unopposed application of the California Women's Law Center for leave to file an amicus curiae brief in support of K.T.'s appeal.

## DISCUSSION

The record shows the trial court used an incorrect legal standard and failed to apply the "good cause" standard based on the totality of circumstances (Fam. Code, §§ 6320, subd. (a), 6301, subd. (d)) in determining whether to include the children as protected parties.

I.     *Standard of Review*

The court's issuance of a restraining order under the DVPA is discretionary.  (§ 6300, subd. (a).)  We review an order granting or denying a DVRO for abuse of discretion.  (*In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933.)  " 'A trial court's exercise of discretion will not be disturbed on appeal unless, as a matter of law, an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same

14

circumstances.' " (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480, italics omitted.)

" 'The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review.' " (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116 (*F.M. & M.M.*); *Bailey v. Murray* (2024) 102 Cal.App.5th 677, 684.)

To the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12 (*Curcio*).) In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence to support the trial court's findings. (*Ibid*.) We do not determine credibility or reweigh the evidence. (*Ibid*.)

II.  *The Domestic Violence Prevention Act*

The Domestic Violence Prevention Act (DVPA) (§ 6200 et seq.) exists "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) Under the DVPA, a court is authorized to issue a protective order enjoining a party from engaging in specific acts of harassment or abuse against a spouse or cohabitant and excluding a party from a dwelling. (§§ 6211, subds. (a), (b), 6218, subd. (a), 6320–6322.) The court may issue a DVRO if evidence is provided showing "reasonable proof of a past act or acts of abuse"; the court may issue an order under this part based solely on the affidavit or testimony of the person requesting the restraining order. (§ 6300, subd. (a).) The DVPA requires a showing of past

15

abuse by a preponderance of the evidence. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.)

The DVPA defines domestic violence, as relevant here, as abuse perpetrated against a cohabitant/former cohabitant, or a person with whom he had a dating relationship and/or or a child with. (§ 6211, subds. (b), (c), & (d).) Section 6203, subdivision (a), defines "abuse" for purposes of the DVPA as conduct described by any of the following four categories: (1) intentionally or recklessly causing or attempting to cause bodily injury; (2) sexual assault; (3) placing a person in reasonable apprehension of imminent serious bodily injury to that person or to another; or (4) engaging in any behavior that has been or could be enjoined pursuant to section 6320. (§ 6203, subd. (a).) Section 6320, subdivision (a), provides in part that "[t]he court may issue an ex parte order enjoining a party from attacking, striking, stalking, threatening, sexually assaulting, . . . contacting, . . . or disturbing the peace of the other party, and, *in the discretion of the court, on a showing of good cause, of other named family or household members*." (§ 6320, subd. (a), italics added.) "The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief." (§ 6301, subd. (d).)

"Disturbing the peace" for purposes of section 6320 refers to "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly . . . . This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with the person's free will and personal liberty. Examples of coercive control include, but are not limited to, unreasonably engaging in

16

. . . [¶] (1) Isolating the other party from friends, relatives, or other sources of support. [¶] . . . [¶] (3) Controlling, regulating, or monitoring the other party's movements, communication, daily behavior, finances, economic resources, or access to services." (§ 6320, subd. (c).)

The Legislature designed the DVPA " 'to be exercised liberally,' " which is reflected by the statute's relatively low standard of proof that requires only " 'reasonable proof' " of at least one past act of abuse. (*Curcio, supra,* 47 Cal.App.5th at p. 11; see *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [explaining the liberality under the DVPA compared to a civil harassment restraining order, including the standard of proof required].) An overly restrictive application of the DVPA would lead to outcomes that run afoul of the Act's outcome and intent. (See *F.M. & M.M., supra,* 65 Cal.App.5th at p. 116 [" '[W]e consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose.' "].)

III.    *The Trial Court Abused its Discretion in Denying K.T.'s Request to Include the Children as Protected Parties*

K.T. argues the children should have been added as protected parties. She contends the trial court applied an incorrect standard and failed to apply the "good cause" standard. She further contends good cause existed to name the children as protected parties on the DVRO based on the totality of circumstances.

We agree the record provides that the trial court made both an error in fact and an error in applying the law.

First, the trial court found "*the children were not listed as protected parties under [K.T.'s] current request*" and concluded it "is not going to list them as protected parties under the domestic

17

violence restraining order." (Italics added.) The record dispositively shows the trial court was factually mistaken. K.T. asked in item 8 of her DVRO request that her three daughters—D.S., I.S., and H.S.—be named as "other protected people." Thus, the requirement that DVRO orders be made "after notice and a hearing" is met (§ 6340, subd. (a)(1)).

Moreover, the reporter's transcript shows K.T. "want[ed] to highlight . . . about the children since the initial [TRO] did not include them as protected parties." K.T. wanted to "describe some of the events that—that the children were present for." However, the trial court interjected that "this doesn't seem to me to be directly relevant to the [DVRO] that's at issue." It is apparent the trial court was operating under the misapprehension that "the children were not listed as protected parties under [K.T.'s] current request" and thus the testimony "doesn't seem directly relevant to the [DVRO] that's at issue." Because the trial court denied the requested relief based, in part, on its inaccurate factual assumption, we reverse.

Second, K.T. contends the trial court abused its discretion through misapplication of the law. K.T. argues the trial court failed to apply the "good cause" standard based on the totality of the circumstances in ruling on her request to include the children as other protected people in the DVRO. We agree with K.T.

Section 6320, subdivision (a), by its plain language, only requires a showing of "good cause" for the inclusion of family or household members as other protected parties in a DVRO. (§ 6320, subd. (a).) In determining whether there is good cause to include children as protected parties, the court considers the totality of the circumstances. (§ 6301, subd. (d); *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144.) A showing or finding of

18

"potential jeopardy to the safety or well-being of the children is not a necessary predicate for including them as protected parties; it is but one factor the court must consider in the totality of the circumstances." (*M.S. v. A.S.*, at p. 1144; *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 642.) "In other words, 'while a showing of potential jeopardy to the safety of the children might be found sufficient for including them as protected parties, it is not a necessary predicate for doing so.'" (*M.S. v. A.S.*, at p. 1144.) Instead, "the court must consider the totality of the circumstances." (*J.H. v. G.H.*, at p. 643; § 6301, subd. (c).)

Here, the trial court found during the August 7, 2023 DVRO proceeding "that abuse that occurs in front of children is still certainly very traumatic to children and should not occur. However, there has been no credible evidence, at least, in front of this court regarding any physical or sexual abuse that has been sustained by the children in this case." The record demonstrates the trial court incorrectly limited its inquiry to whether the children were physically or sexually abused by E.S. This is not a valid legal basis to deny the requested relief. (See *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820–821 [abuse of discretion to apply incorrect legal standard].) Contrary to the trial court's stated reasoning, section 6320, subdivision (a), by its plain language, requires only a showing of "good cause" for the inclusion of family members in a DVRO. (§ 6320, subd. (a).) There is no requirement that K.T. demonstrate that E.S. directly abused the children, physically or sexually. (See *M.S. v. A.S.*, *supra*, 76 Cal.App.5th at p. 1144 [while a showing of potential jeopardy to the safety of the children might be found sufficient for including them as protected parties, it is not a necessary predicate for doing so]; see also § 6203, subd. (b) [abuse is "not

19

limited to the actual infliction of physical injury or assault"].) We agree with K.T. that the trial court misapplied the law and used an incorrect standard in deciding whether or not to include the children in the DVRO as other protected persons. (See *F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 116 [" ' "[A] discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal." ' "].)

Finally, K.T. argues she has provided uncontroverted evidence showing "good cause" exists warranting inclusion of the parties' children in the DVRO. K.T. argues there is no need to remand for the trial court to reconsider the issue, and urges us to decide based on the existing evidence; this approach, she argues, would prevent the unnecessary expenditure of judicial resources, avoid further delays in reaching a final resolution of the DVRO matter, and spare her from having to re-testify on issues that could potentially retraumatize her.

We agree.

In determining whether good cause exists to extend protection to family members in the context of a restraining order proceeding pursuant to the analogous Elder Abuse Act (compare § 6320, subd. (a), with Welf. & Inst. Code, § 15657.03, subd. (b)(5)(A) [same language—"on a showing of good cause, of other named family or household members"]), the reviewing court in *Tanguilig v. Valdez* defined, in a case of first impression, what is good cause. "Generally, 'good cause as a standard "is relative and depends on all the circumstances." ' [Citation.] ' "[I]n determining the meaning of 'good cause' in a particular context, the courts utilize common sense based upon the totality of the circumstances," which "include[s] the purpose of the underlying

20

statutory scheme." ' [Citation.] ' "As a general rule, . . . 'good cause' includes reasons that are fair, honest, in good faith, not trivial, arbitrary, capricious, or pretextual, and reasonably related to legitimate needs, goals, and purposes." ' [Citation.] 'The concept of good cause should not be enshrined in legal formalism; it calls for a factual exposition of a reasonable ground for the sought order.' " (*Tanguilig v. Valdez* (2019) 36 Cal.App.5th 514, 527–528.)  We find the same applies in considering "good cause" in the DVPA context.

K.T.'s declaration[7] and testimony include undisputed evidence that the children were present and exposed to the June 13, 2022 altercation where E.S. physically abused K.T. in the children's presence resulting in the children "screaming, telling him to stop."  K.T.'s declaration and testimony also include undisputed evidence that five days later, E.S. physically abused K.T. ("severely beat" her with a buckle) while the parties' daughters H.S. and D.S. were in the same room and bed.  In fact, the trial court itself told K.T.'s counsel, "I do take your point . . . that abuse that occurs in front of children is certainly very traumatic to children and should not occur."  This demonstrates to us the trial court found credible and true evidence that E.S.'s abuse of K.T. was witnessed by the children.

Witnessing one parent's domestic abuse of another parent once, let alone multiple times, may constitute abuse of the

---

[7]     A trial court may issue a DVRO after notice and a hearing "based *solely* on the affidavit or testimony of the person requesting the restraining order."  (§§ 6300, subd. (a), italics added; 6340, subd. (a)(1); *F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 118 ["the DVPA does not impose . . . any corroboration requirement"].)

children in that it may qualify as "disturbing the peace" of another (§ 6320, subd. (c)). We find it qualifies as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm" of a child (see *ibid.*), or in the trial court's own words, "is certainly very traumatic to children." We find the direct, uncontested evidence provided by K.T. qualifies as more than sufficient "good cause" warranting inclusion of the children as protected parties in the DVRO.

Even when "children are not direct targets of violence in the home, they can be harmed by witnessing its occurrence." (Child Welfare Information Gateway, *Child Witnesses to Domestic Violence* (2021) U.S. Department of Health and Human Services, Administration of Children and Families, Children's Bureau <https://www.childwelfare.gov/resources/child-witnesses-domestic-violence/> [as of March 21, 2025], archived at <https://perma.cc/9UMB-ZK7L>.) Specifically, "[c]hildren who witness domestic violence can suffer severe emotional and developmental difficulties that are similar to those of children who are direct victims of abuse." (*Ibid.*) "There is a positive correlation between domestic violence and child abuse, and children, even when they are not physically assaulted, suffer deep and lasting emotional, health, and behavioral effects from exposure to domestic violence." (Assem. Bill No. 2089 (2013–2014 Reg. Sess), Stats. 2014, ch. 635, § 1, subd. (d).) "The overlap between children witnessing domestic violence and being abused themselves has been widely documented as well." (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 403 (conc. opn. of Streeter, J.); see Edleson, The Overlap Between Child Maltreatment and Woman Abuse (rev. Apr. 1999) National Online Research Center on Violence Against Women, pp. 2–3

<https://vawnet.org/sites/default/files/materials/files/2016-09/AR_Overlap.pdf> [as of March 21, 2025], archived at <https://perma.cc/WZ4Y-BQB6>.)

It was error for the trial court to exclude the children from the DVRO given the undisputed evidence before it. Accordingly, we reverse the trial court's denial of K.T.'s request to include the children in the DVRO and find good cause exists to include the children as other protected parties. We direct the trial court on remand to modify the DVRO in accordance with this decision. We otherwise affirm.

## DISPOSITION

The trial court's order is affirmed in part and reversed in part. We find good cause exists warranting inclusion of the parties' children as other protected parties in the DVRO. We direct the trial court on remand to modify the DVRO to include the children as other protected persons. Costs are awarded to appellant K.T.


**CERTIFIED FOR PUBLICATION**



STRATTON, P. J.

We concur:



GRIMES, J.                    VIRAMONTES, J.